# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3291

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Don Lamar Love, also known as Pink, | * |
| | * |
| Appellant. | * |

_____

No. 99-3384

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Dewayne D. Phillips, also known as | * |
| Boss, | * |
| | * |
| Appellant. | * |

Appeals from the United States
District Court for the Western
District of Missouri.

[PUBLISHED]

_____

Submitted:  March 14, 2000

Filed:  June 15, 2000

_____

Before MORRIS SHEPPARD ARNOLD and FAGG, Circuit Judges, and BENNETT,[*] District Judge.

_____

PER CURIAM.

Don Lamar Love and Dewayne D. Phillips (collectively the appellants) appeal their drug-related convictions and sentences. We affirm.

The appellants raise several contentions related to their trial. We reject all of their arguments. First, the record contains substantial evidence on which the jury reasonably could have found Love guilty of conspiracy to distribute cocaine. Second, having considered Phillips's allegations of trial error related to the district court's voir dire about racial bias, the admission of drug evidence offered by the government, and the jurors' review of trial exhibits during deliberations, we find no abuse of discretion by the district court.

The appellants also raise arguments about their sentences. We reject these arguments as well. The district court's sentence-related factual findings about drug quantities have ample support in the record and none are clearly erroneous. Because the district court made no mistakes when imposing the appellants' sentences, we must affirm the sentences.

Having satisfied ourselves that the cases were well tried in the district court, that no error of law or fact appears, and that the appellants' appeals simply involve the application of settled principles of law to unique facts, we conclude the issues do not warrant a comprehensive opinion. We thus affirm the appellants' convictions and sentences without further discussion. See 8th Cir. R. 47B.

---

[*]The Honorable Mark W. Bennett, Chief Judge, United States District Judge for the Northern District of Iowa, sitting by designation.

BENNETT, Chief District Judge, concurring in part and dissenting in part.

No other issue in American history and contemporary life is more troubling, or more elusive in its solution, than the issue of racial prejudice. This case reminds us that racial prejudice is also a fundamental concern in our nation's criminal justice system, where justice must not only be "color blind" in some abstract sense, but must be color blind and perceived to be so in its concrete application in each case. *Cf. In re Murchison*, 349 U.S. 133, 136 (1955) ("To perform its high function in the best way 'justice must satisfy the appearance of justice.'") (citing and quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)); *see also Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting) ("Our Constitution is color-blind. . . ."). In pursuit of this goal in jury trials, voir dire is the most powerful engine available for ferreting out racial prejudice, or the potential for racial prejudice, among potential trial jurors. Yet, upon a request from a defendant, how probing of an inquiry must a trial judge make in voir dire, or allow defense counsel to make, into the racial attitudes, beliefs, biases, or prejudices of prospective jurors? That is the question raised in this case. Because I believe that the trial judge's well-meaning, but truncated inquiry into racial prejudice during voir dire in this case did not create a reasonable assurance that racial prejudice would be discovered, if present, I respectfully dissent from that part of the majority decision affirming the conviction of defendant Dewayne D. Phillips.[1]

## I. BACKGROUND

Some context for evaluating this critical question in this case is required. Defendant Phillips was one of two African-American males convicted by an all-white jury in southwest Missouri of multiple offenses related to crack cocaine. Before trial, in an attempt to discover any racial prejudice among the prospective jurors, counsel for the defendants propounded twenty-two questions for the district court to ask in voir

---

[1]Although both defendants raised below the adequacy of the trial court's voir dire on racial prejudice, only defendant Phillips raised this issue on appeal.

dire concerning the jurors' attitudes toward African-Americans. The district court declined to ask any of those questions. Instead, the court fashioned its own inquiry, which consisted only of the following:

> You will have observed that the defendants in this case are African-Americans. I do not have to tell you, but for purposes of this question I will tell you, that race is not an issue in this case. It cannot be. It must never be an issue in deciding the guilt or innocence of a defendant.
>
> Is there anyone here who for whatever reason cannot follow that simple basic principle? (No response)
>
> I take it from your silence, then, that you are pledged to give these defendants a fair and impartial trial notwithstanding their ancestry. (No response)

Trial Transcript, 56.

## II. ARGUMENTS OF THE PARTIES

On appeal, Phillips argues that the district court's voir dire was inadequate, because it did not delve into the question of whether any juror possessed a possible prejudice or bias against African-Americans. Accordingly, Phillips argues that the district court abused its discretion by engaging in voir dire that was insufficient to ensure that a fair and impartial jury was impaneled in this case. The government, however, asserts that the district court's voir dire was not an abuse of discretion. The government contends that, because the district court made it clear that the jurors could not make inferences of guilt or innocence based on the defendant's race, and asked whether the jurors could follow that instruction, Phillips was not deprived of a fair trial in this case.

### III.  LEGAL ANALYSIS
### A.  The Cordova Decision

The government argued, in its brief on appeal, that this court's decision in *United States v. Cordova*, 157 F.3d 587 (8th Cir. 1998), supported the conclusion that the district court in this case did not abuse its discretion.  First, the government contended that, as in *Cordova*, the district court below made clear that it was improper for jurors to draw an inference of guilt or innocence based on the defendants' race and asked if the jurors could follow that instruction.  Joint Brief for Appellees, 25 (citing *Cordova*, 157 F.3d at 595).  Second, the government asserted that *Cordova* supported the district court's rejection of the questions propounded by the defendants here, because those questions would have failed to uncover any bias, while exaggerating the relevance of the racial issue.  *Id.*

I readily acknowledge that the decision in *Cordova* involved a similar voir dire technique, that is, a request by the district court for a "pledge" from the prospective jurors that they would disregard any inference of guilt or innocence based on the defendant's race.  *See Cordova*, 157 F.3d at 595.  The decision in *Cordova* also does require courts to "balance competing concerns" by "admonish[ing] against racial bias," but "not overemphasiz[ing] race," *id.*, a principle with which I again have no quibble.  However, as the government conceded at oral arguments, the appeal in *Cordova* was premised on an issue not presented here:  The question on appeal in *Cordova* was whether the district court's statement "suggested that being Hispanic created an inference of guilt," thus depriving the defendant of a fair trial, which this court rejected, *see id.*, while the question presented here is whether the district court's statements sufficiently probed the possible racial prejudices of the prospective jurors to ensure a fair trial.  In other words, the appeal here is premised on what the district court failed to say, not on what the district court did say, and *Cordova* is not controlling.  However, I find guidance in other authority on the question of the adequacy of the district court's voir dire relating to racial prejudice in this case.

### B. The Purpose Of Voir Dire

It is well to begin with a reminder of the purpose of voir dire. As Justice White explained, announcing the judgment of the Supreme Court in *Rosales-Lopez v. United States*, 451 U.S. 182 (1981), and writing for a plurality of the justices,

> Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.

*Rosales-Lopez*, 451 U.S. at 188. *Accord Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) (voir dire "serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges"); *Harold v. D. Corwin, M.D.*, 846 F.2d 1148, 1150 (8th Cir. 1988) (recognizing that the purpose of voir dire is to afford the parties a trial by a qualified, unbiased, and impartial jury).

The effect of voir dire upon a defendant's ability to exercise peremptory challenges should not be minimized, because the role of the peremptory challenge has long been recognized "in reinforcing a defendant's right to trial by an impartial jury." *See United States v. Martinez-Salazar*, ___ U.S. ___, 120 S. Ct. 774, 779 (2000); *see also Pointer v. United States,* 151 U.S. 396, 408 (1894) (Mr. Justice Harlan, writing for a unanimous Court, thought that the right to challenge was "one of the most important rights secured to the accused" and that "[a]ny system for the impaneling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right must be condemned."); *United States v. Sithithongtham*, 192 F.3d 1119, 1121 (8th Cir. 1999) ("Although peremptory challenges are not a constitutional right, the challenge has long been recognized as 'one of the most important rights secured to the

accused.'") (quoting *Swain v. Alabama*, 380 U.S. 202, 219 (1965)). Peremptory challenges are necessary "not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise." *Pointer*, 151 at 408.

### C. Discretion And Standards Of Review

Both as a matter of decisional law and procedural rule, "federal judges have been accorded ample discretion in determining how best to conduct the voir dire." *Rosales-Lopez*, 451 U.S. at 189 (citing *Aldridge v. United States*, 283 U.S. 308, 310 (1931), *Ham v. South Carolina*, 409 U.S. 524, 528 (1973), and FED. R. CRIM. P. 24(a)). For example,

> Rule 24(a), Federal Rules of Criminal Procedure, provides that the trial court may decide to conduct the voir dire itself or may allow the parties to conduct it. If the court conducts it, the parties may "supplement the examination by such further inquiry as [the court] deems proper"; alternatively, the court may limit participation to the submission of additional questions, which the court must ask only "as it deems proper."

*Rosales-Lopez*, 451 U.S. at 189.

However, as Justice White also explained in *Rosales-Lopez*, voir dire relating to racial prejudice, in a particular case, may be so inadequate as to constitute an abuse of discretion, under either a "constitutional" or a "nonconstitutional" standard of fairness. *See Rosales-Lopez*, 451 U.S. at 189-90; *Sithithongtham,* 192 F.3d at 1122 (the court's discretion in the conduct of voir dire is subject to "the essential demands of fairness.") (internal quotation marks and citations omitted). The "constitutional" standard for questioning prospective jurors about racial or ethnic bias is implicated by "special circumstances," described in *Ristaino v. Ross*, 424 U.S. 589 (1976), "under which the Constitution requires a question on racial prejudice." *Rosales-Lopez*, 451

U.S. at 189. The "nonconstitutional standard," on the other hand, stems from the Supreme Court's "supervisory authority over the federal courts," and requires "that questions directed to the discovery of racial prejudice be asked in certain circumstances in which such an inquiry is not constitutionally mandated." *Id.* at 190 (citing *Ristaino*, 424 U.S. at 597 n.9).

### 1.    The "constitutional" standard

The "special circumstances" under which the Constitution itself makes it reversible error to fail to ask questions regarding racial prejudice of jurors are those in which racial issues are "inextricably bound up with the conduct of the trial," or the defendant's conduct or defense to the charges is "likely to intensify any prejudice that individual members of the jury might harbor." *Ristaino*, 424 U.S. at 597; *see also Rosales-Lopez*, 451 U.S. at 189-90. In *Ristaino*, the Court distinguished its prior decision in *Ham v. South Carolina*, 409 U.S. 524 (1973)—in which the Court concluded that the Constitution required voir dire questions concerning racial prejudice—from the case before the Court—in which the Court held that the constitutional requirement was not implicated. *Ristaino*, 424 U.S. at 596-97. The Court explained that, in *Ham*, the Court had held that the constitutional standard was implicated, because of the black defendant's assertion that he was framed for a crime in retaliation for his widely-known civil rights activities. *Id.* In *Ristaino*, however, the Court found that "[t]he mere fact that the victim of the crimes alleged was a white man and the defendants were Negroes was less likely to distort the trial than were the special factors involved in *Ham*." *Id.* at 597. The Court in *Ristaino* held that "[t]he circumstances thus did not suggest a significant likelihood that racial prejudice might infect [the defendant's] trial." *Id.* at 598. Similarly, in *Rosales-Lopez*, the Court concluded that there had been no "unconstitutional" abuse of discretion in failing to conduct voir dire concerning racial prejudice, because the petitioner in that case had never argued that the matters at issue in his trial involved allegations of racial or ethnic prejudice. *Rosales-Lopez*, 451 U.S. at 192.

## 2. The "nonconstitutional" standard

In contrast, the "nonconstitutional standard," under which the Court has also decreed that it is reversible error for a trial court not to ask questions concerning jurors' racial prejudices, involves conflicts in "the appearance of justice in the federal courts." *Id.* at 190. As Justice White explained,

> On the one hand, requiring an inquiry in every case is likely to create the impression "that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth." *Ristaino, supra*, 424 U.S., at 596, n.8, 96 S. Ct., at 1021, n.8. Trial judges are understandably hesitant to introduce such a suggestion into their courtrooms. *See Aldridge, supra*, 283 U.S., at 310, 51 S. Ct., at 471; *Ristaino, supra*, 424 U.S., at 591, 96 S. Ct., at 1018. Balanced against this, however, is the criminal defendant's perception that avoiding the inquiry does not eliminate the problem, and that his trial is not the place in which to elevate appearance over reality.

*Rosales-Lopez*, 451 U.S. at 190-91; *cf. Cordova*, 157 F.3d at 595 ("In making this inquiry [concerning racial bias], the court must balance competing concerns. The court must admonish against racial bias, but must not overemphasize race.").

To resolve these competing interests, and thus to satisfy the "nonconstitutional" standard of an appearance of fairness, a plurality of the justices in *Rosales-Lopez* concluded as follows:

> In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a

-9-

reasonable possibility that racial or ethnic prejudice might have influenced the jury.

*Rosales-Lopez*, 451 U.S. at 191. Thus, the circumstances the plurality envisioned as implicating this "nonconstitutional" standard involved (1) a defendant's request for voir dire concerning racial prejudice, (2) the district court's determination of whether the circumstances of the case indicate that there is a reasonable possibility that racial prejudice might influence a jury, and if so (3) the district court's inclusion in voir dire of appropriate questions addressed to racial prejudice. *Id.* Furthermore, the conditions implicating the "nonconstitutional" standard are distinguishable from those implicating the "constitutional" standard on the basis of the degree of likelihood that racial prejudice will infect the proceedings: To implicate the "constitutional" standard, the circumstances must "suggest a *significant likelihood* that racial prejudice might infect [the defendant's] trial," *Ristaino*, 424 U.S. at 598 (emphasis added), whereas to implicate the "nonconstitutional" standard, "the circumstances of the case [must only] indicate that there is a *reasonable possibility* that racial or ethnic prejudice might . . . influenc[e] the jury." *Rosales-Lopez*, 451 U.S. at 191 (emphasis added).

Justice White endeavored to clarify the circumstances in which this "reasonable possibility" of prejudice would exist:

> In *Ristaino*, the Court indicated that under the circumstances of that case, a federal trial court would have been required to "propound appropriate questions designed to identify racial prejudice if requested by the defendant." 424 U.S., at 597, n. 9, 96 S. Ct., at 1022, n. 9. In *Ristaino*, the Court also made clear that the result reached in *Aldridge*, was based on this Court's supervisory power over the federal courts. 424 U.S., at 598, n. 10, 96 S. Ct., at 1022, n. 10. In *Aldridge*, which *Ristaino* embraced, the Court held that it was reversible error for a federal trial court to fail to inquire into racial prejudice in a case involving a black defendant accused of murdering a white policeman. The

-10-

circumstances of both cases indicated that there was a "reasonable possibility" that racial prejudice would influence the jury.

>   *Aldridge* and *Ristaino* together, fairly imply that federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups. This supervisory rule is based upon and consistent with the "reasonable possibility standard" articulated above. It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise such a possibility. There may be other circumstances that suggest the need for such an inquiry, but the decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts.

*Rosales-Lopez*, 451 U.S. at 191-92. It was only on the last paragraph quoted above, and indeed, on the first sentence of that paragraph, that the plurality opinion failed to obtain a majority. *See id.* at 194-95 (Rehnquist, J., joined by Burger, C.J., concurring in the result). The concurring justices "fear[ed] that [the paragraph's] use of the term 'violent crime' and the term 'different racial or ethnic groups' is apt to spawn new litigation over the meaning of those terms and whether the trial court properly assessed the possibility of racial or ethnic prejudice infecting the selection of the jury." *Id.* at 194. However, the concurring justices did not disagree with the proposition that prejudice might occur in such cases, or in other circumstances, which would suggest to the trial judge that an inquiry into the possibility of prejudice was required. *Id.* Thus, reading the plurality and concurring opinions in *Rosales-Lopez* together, it is clear that, under this "nonconstitutional standard," "[f]ailure to honor [a defendant's] request [for voir dire concerning racial or ethnic prejudice] will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that

racial or ethnic prejudice might have influenced the jury." *Id.* at 191 (plurality opinion); *see also id.* at 194-95 (concurring opinion).

### D. Is Either Standard Implicated Here?

Which standard is implicated here, the "constitutional" or the "nonconstitutional/appearance of justice" standard? The majority does not address that question, concluding instead that there was no abuse of discretion in the trial court's truncated inquiry into racial prejudice, thereby suggesting that neither standard was implicated, or if one was implicated, it was satisfied. I believe more is required.

### 1. The "constitutional" standard

However, I must conclude that it is not the "constitutional" standard that is implicated here. Phillips did not assert that he was being prosecuted in retaliation for civil rights activities or otherwise suggest that issues in the trial involved allegations of racial prejudice, nor are there any other "substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors" present in this case. *See Rosales-Lopez*, 451 U.S. at 190 & 192; *Ristaino*, 424 U.S. at 597; *Ham*, 409 U.S. at 527-28. Thus, the "special circumstances" that would give rise to a constitutional requirement of an inquiry into racial prejudice—circumstances in which either (1) racial issues are "inextricably bound up with the conduct of the trial," or (2) the defendant's conduct or defense to the charge is "likely to intensify any prejudice that individual members of the jury might harbor"—are lacking in this case. *Ristaino*, 424 U.S. at 597; *see also Rosales-Lopez*, 451 U.S. at 189-90.

### 2. The "nonconstitutional" standard
### a. The "violent criminal act" factor

Nor do I find that this case involved "a violent criminal act with a victim of a different racial or ethnic group," which would almost certainly have implicated the "nonconstitutional" standard, as it would have "suggest[ed] a reasonable possibility that racial or ethnic prejudice [would] affect the jury." *Rosales-Lopez*, 451 U.S. at 192

(plurality decision). As in *Rosales-Lopez*, the crimes with which defendants Love and Phillips were charged were, at least legally, "victimless." *See id.*

### b. Presence of "external circumstances"

Nevertheless, I find that I must examine whether this case still "falls within that category of cases in which the trial court must determine if the external circumstances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence." *See id.* at 192-93. In my view, the circumstances of this case clearly do indicate such a "reasonable possibility."

*i. The defendants' request for an inquiry*. The defendants were concerned that the issue of racial prejudice might be a factor in this case. Because the prospective jurors' attitudes towards African-Americans were unknown, the defendants desired to learn more information. Accordingly, they submitted questions to the district court that were designed to identify those jurors whose attitudes towards African-Americans were either prejudicial or unfavorable. Thus, the defendants specifically requested voir dire concerning racial prejudice, satisfying one requirement for application of the "nonconstitutional" standard. *See Rosales-Lopez*, 451 U.S. at 191 (leaving to the defendant, in the first instance, the determination of whether he or she "would prefer to have the inquiry into racial or ethnic prejudice pursued").

*ii. A "reasonable possibility" of racial prejudice*. The question then becomes whether the circumstances in this case presented a "reasonable possibility that racial or ethnic prejudice might have influenced the jury," and hence required sufficient voir dire by the district court to probe the jurors' possible racial prejudices or biases. *Rosales-Lopez*, 451 U.S. at 191. That question is readily answered.

Here, both defendants are African-American males. They were charged with multiple offenses involving crack-cocaine in southwest Missouri. This court has previously noted that defendants prosecuted for crack-cocaine offenses in the Western

-13-

District of Missouri are predominantly African-American. *See United States v. Simmons*, 964 F.2d 763, 767 (8th Cir.) (noting that 97% of defendants prosecuted for crack offenses in the Western District of Missouri from 1988-1989 were African-American), *cert. denied*, 506 U.S. 1011 (1992). During 1993, of those sentenced for crack cocaine offenses nationwide, 88.3% were African-American, 7.1% Hispanic, 4.1% White, and 0.5% "Other." UNITED STATES SENTENCING COMMISSION, SPECIAL REPORT TO THE CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY, 2 (April 1997). Additionally, according to a report of the National Institute on Drug Abuse, crack cocaine use is most common among young and middle-aged adults, males, especially African-Americans, residents of metropolitan areas, those with less than a high school education, and the unemployed. NATIONAL INSTITUTE ON DRUG ABUSE, NATIONAL HOUSEHOLD SURVEY ON DRUG ABUSE: MAIN FINDINGS 1991, 60 (Table 4.6) (May 1993). Thus, this case involved African-American defendants charged with drug offenses commonly associated with African-American defendants.

Moreover, the case involving these defendants and these charges was tried before an all-white jury in a predominantly white area of Missouri.[2] A simple fact that

_____

[2]Phillips submitted the following census data, which the government does not dispute, concerning the small percentage of African-Americans in the Southern Division of the Western District of Missouri:

| | |
|---|---|
| Cedar County: | 0% African-American |
| Christian County: | 0.2% African-American |
| Dade County: | 0.1% African-American |
| Dallas County: | 0.1% African-American |
| Greene County: | 1.7% African-American |
| Howell County: | 0% African-American |
| Laclede County: | 0.3% African-American |
| Ozark County: | 0% African-American |
| Pulaski County: | 13.6% African-American |
| Taney County: | 0.1% African-American |

*See* Appellant Phillips's Addendum, 13 (citing MISSOURI STATE CENSUS DATA

cannot go unnoticed is that racial issues were present here, or in the very least, racial issues were potentially present here.  *See* Paul Butler, *Racially Based Jury Nullification:  Black Power In The Criminal Justice System*, 105 YALE L.J. 677, 686 (1995) (recognizing the reality that race does matter, in general, and in jury adjudications of guilt and innocence, in particular); *see also* 2 NATIONAL JURY PROJECT, INC., JURYWORK:  SYSTEMATIC TECHNIQUES (Elissa Kraus & Beth Bonora eds., 2d ed. 1997) (hereinafter "JURYWORK") § 17.03[4] at 17-52 ("Jurors' judgments are influenced by the race of the participants in a trial. . . .   Whenever criminal defendants . . . are minority group members, attention must be directed to exploring white prospective jurors' racial beliefs and attitudes.") & § 21.02 at 21-8 ("Race and ethnicity permeate almost all aspects of a case.").  Indeed, this court has held that "[f]ederal courts are *required* to inquire as to possible racial biases of veniremen when the defendant is a member of a racial minority."  *See United States v. Reddix*, 106 F.3d 236, 238-39 (8th Cir. 1997) (emphasis added) (citing the post-*Rosales-Lopez* case of *Swink v. City of Pagedale*, 810 F.2d 791, 793 (8th Cir.), *cert. denied*, 483 U.S. 1025 (1987), which in turn cites *Aldridge*, 283 U.S. 308, and *Ham*, 409 U.S. at 527).

In these circumstances, "avoiding the inquiry [concerning racial prejudice] does not eliminate the problem," but would instead "elevate appearance over reality." *Rosales-Lopez*, 451 U.S. at 191.  Thus, the "nonconstitutional" standard for voir dire concerning racial prejudice was implicated in this case, and failure to pursue the requested inquiry, at least to some degree, would constitute reversible error.  *See Rosales-Lopez*, 451 U.S. at 191.

---

CENTER, SELECTED 1990 CENSUS SOCIAL AND ECONOMIC INDICATOR BASIC TABLES (University of Missouri at Columbia 1992)).  Phillips explains that the comparatively high percentage of African-Americans in Pulaski County is because a United States Army base, Fort Leonard, is located there.  *Id.*  The government does not appear to dispute that contention, either.

### E. Adequacy Of The Inquiry

The government argues that, even assuming the "reasonable possibility" of racial prejudice existed, the district court *did* make some inquiry concerning racial prejudice, so that no reversible error occurred in this case. I acknowledge that the district court made an inquiry of sorts into racial prejudice of jurors. Thus, the remaining issue is the *adequacy* of the district court's inquiry into racial prejudice.

#### 1. The test

As this court explained in *Llach v. United States*, 739 F.2d 1322 (8th Cir. 1984), where an inquiry concerning racial prejudice is not constitutionally mandated, "the reviewing court should consider the 'effectiveness of the trial court in reasonably assuring that the prejudice would be discovered if present.'" *Llach*, 739 F.2d at 1333 (quoting *United States v. Groce*, 682 F.2d 1359, 1362-63 (11th Cir. 1982), with internal citations omitted). "If voir dire was conducted in such a manner [as] to eliminate a reasonable possibility that racial or ethnic prejudice might influence the jury's evaluation of the evidence, then there is no reversible error." *Id.* (citing *Rosales-Lopez*, 451 U.S. at 192-93).

The test of adequacy of voir dire concerning racial prejudice articulated in *Llach* is comparable to the test used in this circuit—and indeed in the Third, Fourth, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits—to determine whether a court has adequately questioned prospective jurors regarding lack of impartiality generally. That test is whether "the district court's voir dire [has] created a reasonable assurance that prejudice would be discovered if present." *United States v. Cassel,* 668 F.2d 969, 971 (8th Cir.) (internal quotation marks omitted) (citing *United States v. Delval,* 600 F.2d 1098, 1102-03 (5th Cir. 1979)), *cert. denied*, 457 U.S. 1132 (1982); *accord Waldorf v. Shuta,* 3 F.3d 705, 709 (3d Cir. 1993); *United States v. Lancaster,* 96 F.3d 734, 740 (4th Cir. 1996) (*en banc*), *cert. denied*, 519 U.S. 1120 (1997); *United States v. Beckner,* 69 F.3d 1290, 1292 (5th Cir. 1995); *United States v. Jones*, 188 F.3d 773, 777 (7th Cir.), *cert. denied sub nom. Bailey v. United States*, ___ U.S. ___, 120 S. Ct.

559 (1999); *United States v. Washington*, 819 F.2d 221, 224 (9th Cir. 1987); *United States v. Gillis,* 942 F.2d 707, 709-10 (10th Cir. 1991); *United States v. Schlei,* 122 F.3d 944, 994 (11th Cir. 1997), *cert. denied*, 523 U.S. 1077 (1998); *and compare United States v. Desmarais*, 531 F.2d 632, 633 (1st Cir. 1976) (considering whether the district court's voir dire "fulfilled [the court's] 'serious duty . . . [of determining] the question of actual bias. . . .'") (quoting *Dennis v. United States*, 339 U.S. 162, 168 (1950)); *United States v. Garcia*, 936 F.2d 648, 653 (2d Cir.) (also considering whether the district court's voir dire fulfilled "a 'duty to determine the question of actual bias,'" citing *Dennis*), *cert. denied*, 502 U.S. 986 (1991); *United States v. Tocco*, 200 F.3d 401, 413 (6th Cir. 2000) (considering whether "the district court's voir dire sufficiently explored the prospective jurors' . . . individual ability to be fair and impartial"); *United States v. Schmucker*, 815 F.2d 413, 421 (6th Cir. 1987) (considering whether "the district court made sufficient inquiry of the prospective jurors to permit full disclosure of facts and circumstances which might indicate bias"); *United States v. Edmond*, 52 F.3d 1080, 1089 (D.C. Cir.) (considering whether "the [court's] voir dire was adequate to assure the impaneling of an impartial jury in the circumstances of th[e] case"), *cert. denied*, 516 U.S. 998 (1995).

## 2.    *Application of the test*

The government contends that the voir dire conducted by the district court in this case was adequate. Specifically, the government asserts that the questions proposed by the defense would have drastically exaggerated the relevance of the racial issue, and that the district court's more limited inquiry satisfied the sum and substance of the legitimate questions posed by the defendants. Phillips argues, however, that, whether the jurors harbored certain biases or prejudices against the two African-American defendants was rendered unknowable based on the district court's one and only inquiry. Phillips argues that this is so, because the district court's voir dire did not address, much less touch upon, the content of the questions proposed by the defendants, and thus never probed attitudes of individual jurors.

I cannot agree that the district court's voir dire was in any way "'effectiv[e] . . . in reasonably assuring that the [racial] prejudice would be discovered if present.'" *Llach*, 739 F.2d at 1333 (stating the test for adequacy of voir dire to detect racial prejudice, quoting *Groce*, 682 F.2d at 1362-63); *see also Cassel,* 668 F.2d at 971 (stating that the test for adequacy of voir dire to detect juror bias, in general, is whether "the district court's voir dire [has] created a reasonable assurance that prejudice would be discovered if present.") (internal quotation marks omitted). Nor can I agree that the district court's voir dire in this case was "conducted in such a manner [as] to eliminate a reasonable possibility that racial or ethnic prejudice might influence the jury's evaluation of the evidence." *Id.* (citing *Rosales-Lopez*, 451 U.S. at 192-93). A brief examination of the district court's voir dire will demonstrate my reasons.

### a. *Discovery of racial prejudice*

Rather than beginning with a question designed to elicit responses that might reveal the jurors' true feelings on racial issues, the district court began voir dire with an admonition of the panel as a whole against evaluating the case out of racial bias or prejudice. The court followed this admonition with a single question, again directed to the panel as a whole, asking if there was anyone who *could not* follow the admonition. However, "[t]he group voir dire setting can impede honest statements of opinion or bias." 1 JURYWORK § 2.11[1] at 2-72.30. It is not surprising that the jurors, confronted with a demand for a public response to a closed-ended, non-leading question, following the district court's admonition, provided only a socially acceptable response. *See* 2 JURYWORK § 17.03[4] at 17-53. The district court then took the lack of any negative response to its question as an affirmation or pledge that the jurors would give the defendants a fair and impartial trial "notwithstanding their ancestry." Trial Transcript at 56. However, closed-ended questions, such as the one and only one propounded by the district court, encourage jurors to deny their true feelings and opinions about race, effectively ending the voir dire before it has begun. *See* 2 JURYWORK § 17.03[4] at 17-54. To put it another way, the district court's inquiry virtually foreclosed the defendants from ever discovering any prejudice or bias that the

-18-

prospective jurors harbored against African-Americans, much less their individual, unprompted attitudes towards African-Americans.

What is required instead for an effective voir dire on racial prejudice is "[o]pen-ended, non-leading questions [that] encourage respondents to explain their opinions and attitudes in their own words, thus penetrating stereotyped and socially desirable responses." *See* 1 JURYWORK § 2.11[2] at 2-72.32. *Accord Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981) (observing that, because general inquiries often fail to reveal relationships or interests of the jurors which may cause unconscious or unacknowledged bias, a more probing inquiry is usually necessary). "Voir dire on racial prejudice must be ventured because failure to thoroughly explore the range of prospective jurors' racial attitudes increases the likelihood of seating jurors whose evaluation of the evidence will be seriously skewed by racial bias." 2 JURYWORK § 17.03[4] at 17-52. For instance, during voir dire it is important to explore jurors' contact with African-Americans;[3] to explore how the prospective jurors have analyzed

---

[3]A sample question on this topic proffered by the National Jury Project is the following:

> Some people have many opportunities to meet people of a different race, other people don't have much chance [to] meet people of other races[;] what has your experience been?

*See* 2 JURYWORK § 21.02 at 21-11. The National Jury Project also suggests inquiry into the following matters:

> Does the juror live in the same neighborhood or work in the same place with members of the [racial or ethnic] group [of the defendant]? Do the juror's children go to integrated schools? Has the juror ever had a negative experience with a person from the group?

*Id.*

-19-

and processed their experiences with African-Americans;[4] to explore the jurors' assessments about how society has treated African-Americans in the past and in the present;[5] to explore the jurors' feelings on stereotypes about African-Americans;[6] and the ability of the jurors to put themselves in the defendants' place. Questions covering these areas seek to "uncover a juror's actual life experiences, opinions, and feelings about race issues rather than the jurors' conclusions about whether race 'will affect their ability to be fair and impartial.'" 2 JURYWORK § 21.02 at 21-12.

---

[4]The National Jury Project suggests inquiry into the following matters in relation to this topic:

> Did the juror try to understand the complexity of a particular situation involving interaction or even conflict between members of different [racial or ethnic] groups? What was the juror's understanding of the source of the problem? Did the experience cause the juror to later avoid or seek out members of the particular group involved?

*Id.*

[5]The National Jury Project suggests inquiry into the following matters in relation to this topic:

> Does the juror think that discrimination is a thing of the past? Does the juror feel that anyone who claims discrimination is trying to cover up some personal inadequacy? Does the juror think it is even important to examine the conditions and circumstances faced by members of that group?

*Id.*

[6]Sample questions on this topic proffered by the National Jury Project include the following:

> Do you think that [members of a certain racial or ethnic group] are more likely to commit crimes than whites? Why? Why do you think it happens that more African Americans than whites are arrested, charged, and convicted for drug related crimes?

*Id.* § 17.03[4][a] at 17-57.

Many of the questions propounded by the defendants in this case would have fit these requirements; indeed, many appear to be drawn from the list of suggested questions on ways to explore racial attitudes of prospective jurors provided by the National Jury Project. *See* 2 JURYWORK § 21.02 at 21-13–21-14.1. This court has concluded that a district court does not abuse its discretion by rejecting specific questions propounded by the parties and instead conducting its own voir dire if, *inter alia*, the subjects covered by the requested questions were adequately addressed by the questions actually put by the court. *See United States v. Carter*, 804 F.2d 487, 490 (8th Cir. 1986). I do not suggest that the district court should have asked the venire all twenty-two questions proposed by the defendants. Nor do I think it is appropriate to attempt to set forth a precise formula to which district courts must adhere. Again, courts must "balance competing concerns" by "admonish[ing] against racial bias," but "not overemphasiz[ing] race." *Cordova*, 157 F.3d at 595.

However, the Supreme Court has made clear that the "nonconstitutional" standard for voir dire on racial prejudice "does not depend upon a comparison of the concrete costs and benefits that its application is likely to entail." *Rosales-Lopez*, 451 U.S. at 190. The Court continued, "These are likely to be slight: some delay in the trial versus the occasional discovery of an unqualified juror who would not otherwise be discovered." *Id.* Some validation of the wisdom of rejecting a cost-benefit analysis or fears that too much time or attention will be devoted to such an inquiry comes from my own experience with jury selection in criminal cases involving minority defendants. In virtually every case, following some more general questions, relatively few, open-ended inquiries to individual panel members concerning racial prejudice or bias have prompted an honest, thoughtful response from one or more jurors that the juror's racial bias or prejudice would prevent him or her from being fair and impartial. In such cases, counsel for the United States and the defendants have unanimously agreed that the jurors revealing such prejudices should be excused. In other situations, where the potential juror's answers have been equivocal, the answers to these inquiries have

provided counsel with invaluable information for determining their peremptory challenges.

The district court's single question in this case, particularly when presented to the panel as a whole, in circumstances that required a public response, immediately following an admonition that virtually required a particular answer, failed to approach an inquiry that "adequately addressed" the sum and substance of the defendants' requested questions. *Carter*, 804 F.2d at 490. Nor could such limited voir dire, in such circumstances, possibly have been "'effectiv[e] . . . in reasonably assuring that [racial] prejudice would be discovered if present.'" *Llach*, 739 F.2d at 1333 (quoting *Groce*, 682 F.2d at 1362-63); *Cassel*, 668 F.2d at 971.

### b.  *Elimination of racial prejudice*

Furthermore, although "the court was [not] obligated to ask all the [defendants'] questions in the form submitted by defendants . . . their request raised a judicial duty 'to do what was reasonably practicable to enable the accused to have the benefit of the right of peremptory challenge or to prevent unfairness in the trial.'" *United States v. Dellinger*, 472 F.2d 340, 370 (7th Cir. 1972). As mentioned above, one purpose of voir dire is to permit the parties to exercise their peremptory challenges in an informed and effective manner. *Mu'Min*, 500 U.S. at 431 (voir dire "serves the dual purpose of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges"); *Rosales-Lopez*, 451 U.S. at 188 ("[L]ack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts."); *Harold*, 846 F.2d at 1150 (recognizing that the purpose of voir dire is to afford the parties a trial by a qualified, unbiased, and impartial jury); *see also Darbin*, 664 F.2d at 1113 (in determining the adequacy of a voir dire examination, consideration must be given to whether the questions submitted by counsel are important to the informed exercise of counsel's right to challenge prospective jurors); *Pitasi v. Stratton Corp.,* 968 F.2d 1558, 1563 (2d Cir. 1992) (citing *Darbin*). Similarly, the Seventh Circuit Court of Appeals has explained that a

"trial court should permit a reasonably extensive examination of prospective jurors so that parties have a basis for an intelligent exercise of the right to challenge, whether for cause or peremptorily," and that court will reverse a trial court for abuse of discretion "when limitations placed on the parameters of voir dire threaten to undermine the purpose for conducting an examination of prospective jurors." *Art Press, Ltd. v. Western Printing Machinery Co.*, 791 F.2d 616, 618 (7th Cir. 1986) (*en banc*); *accord Ham*, 409 U.S. at 532 (Marshall, J., dissenting) ("Of course, the right to challenge has little meaning if it is unaccompanied by the right to ask relevant questions on voir dire upon which the challenge for cause can be predicated.") (citing *Swain*, 380 U.S. at 221); 2 JURYWORK § 17.03[4] at 17-52 ("The primary goal of in-depth questioning on racism and racial prejudice is to enhance [the] intelligent exercise of peremptory challenges."). The closed-ended inquiry here precluded the defendants from effectively and intelligently exercising their peremptory challenges, when all they had to rely upon was superficial assertions and pledges, thus making it difficult, if not impossible, for the jury selection process "to eliminate a reasonable possibility that racial or ethnic prejudice might influence the jury's evaluation of the evidence." *Llach*, 739 F.2d at 1333.

## *IV. CONCLUSION*

I am sensitive to the significant burdens already placed on district court judges and I have no desire to add to that burden by hand-cuffing them to a particular litany of questions regarding potential racial prejudice in every jury trial in which a criminal defendant is a member of a racial minority. I also respect the fact that district court judges may, in their discretion, utilize a variety of effective ways to conduct voir dire regarding potential racial prejudice of jurors that are suitable in light of the judge's experience and voir dire technique, the jury selection practices in the judge's district, the circumstances in that district, and the particular circumstances of the case. However, I conclude that the district court's voir dire in the circumstances of this case was not sufficiently probing—in that it could not reasonably assure that racial prejudice would be discovered, if present, *see Llach*, 739 F.2d at 1333; *see also Cassel,* 668 F.2d

at 971, or in any way have eliminated such prejudice, *see id.*—and therefore constituted a failure to conduct the necessary parts of the voir dire requested by the defendants, or to address the sum and substance of their request, in circumstances that suggested a reasonable possibility that racial or ethnic prejudice would affect the jury. *See Rosales-Lopez*, 451 U.S. at 191. As such, the district court's cursory voir dire constituted reversible error under the "nonconstitutional" standard articulated in *Rosales-Lopez*, which relies upon the Court's "supervisory authority" and resolution of conflicts in the "appearance of justice in the federal courts." *See id.*

Consequently, I would reverse the conviction of defendant Phillips, the only defendant to raise this issue on appeal, and remand his case for a new trial. However, I concur in the remainder of the judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.